IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2018 Session

## STATE OF TENNESSEE v. RICHMOND LEBRON MADDEN, SR.

Appeal from the Circuit Court for Rhea County
No. 2014-CR-211     Thomas W. Graham, Judge

### No. E2017-01281-CCA-R3-CD

The Defendant, Richmond Lebron Madden, Sr., was convicted by a jury of one count of possession of 0.5 grams or more of methamphetamine with intent to sell or deliver. On appeal, the Defendant contends that (1) the evidence presented at trial was insufficient to support his conviction; (2) the trial court erred in allowing a witness to testify about the Defendant's relationship with his co-defendant and his living arrangements; (3) the trial court erred in denying his motion to suppress, which challenged the legality of the stop resulting in the Defendant's arrest; and (4) the trial court abused its discretion by denying the Defendant an alternative sentence and sentencing him to nine years and six months of incarceration.[1]  Following our review, the judgment of the trial court is affirmed and remanded for entry of a corrected judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed;
Case Remanded for Entry of Corrected Judgment**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Thomas K. Austin (on appeal), Dunlap, Tennessee; Larry Roddy (at trial), Dayton, Tennessee; and Philip Duval (at sentencing), Chattanooga, Tennessee, for the appellant, Richard Lebron Madden, Sr.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

---

[1] For clarity and ease of discussion, we have reordered the issues as they are set forth in the Defendant's brief.

# FACTUAL BACKGROUND

On December 1, 2014, the Rhea County grand jury indicted the Defendant with one count of possession of 0.5 grams or more of methamphetamine with intent to sell or deliver. See Tenn. Code Ann. §§ 39-17-417, -434. Prior to trial, the Defendant filed a motion to suppress evidence obtained during the traffic stop, and a hearing was held on February 5, 2016.

## I. Suppression Hearing

Rhea County Sheriff's Department Officer Charlie Jenkins testified that he was an investigator and that he was assigned to drug-related cases. Officer Jenkins said that he was working in this capacity on August 25, 2014, and that a confidential informant gave him information regarding the Defendant and a potential drug deal on that date. Officer Jenkins testified that on "several occasions" over the prior two years, this informant had supplied him with information regarding drug activity. Officer Jenkins said that the information he received from this informant was always reliable and that it had led to arrests and convictions.

Officer Jenkins testified that on August 25, 2016, the informant called him and told him that a woman named Sherry Ewton would be driving a "blue four-door car with a dent in the front fender" and that her boyfriend, a black male, would be a passenger in the vehicle. Office Jenkins said that the informant also told him that the two "had been selling meth . . . at the Bi-Lo . . . [and] a gas station adjacent to the Bi-Lo." Officer Jenkins explained that the informant indicated "that they had actually seen what was going on."

Officer Jenkins testified that upon receiving this information, he immediately drove to the Bi-Lo parking lot. He explained that as he arrived, he noticed the described vehicle at the Jiffy parking lot, which was located next to the Bi-Lo parking lot. Officer Jenkins described the vehicle he saw as a "blue four-door Camry with a dent in the front fender" and said that this matched the informant's description. When asked what he did after observing the vehicle, Officer Jenkins said,

> I noticed it, again, at the Jiffy parking lot next door. The vehicle went up to the stop sign, turned south on Market Street and then turned into the Bi-Lo parking lot. It went down three aisles of the parking lot, passing up empty spots. As the vehicle turned to come back down, then I blocked it in front of it.

Officer Jenkins said that after stopping the vehicle, he got out and walked around to the

driver's side of the vehicle. He explained that Ms. Ewton was the driver and that the Defendant was seated in the front passenger seat. Officer Jenkins testified that he "could plainly see meth right there in [Ms. Ewton's] lap" and that when he opened the car door he found drugs "right there in the door jam of the vehicle." Officer Jenkins explained that the substance he observed was a crystal substance and that he suspected it was meth. Officer Jenkins stated that he had not observed any traffic violation and that "the purpose of the stop was . . . they were there to sell methamphetamines and I was there to intercept it."

At the conclusion of the hearing, the trial court denied the Defendant's motion to suppress, and a jury trial began on February 16, 2016.

## II. Jury Trial

At trial, Officer Jenkins explained that he had previously participated in arresting individuals who were in the process of buying and selling drugs. Officer Jenkins explained that on August 25, 2014, he drove to the Bi-Lo parking lot and was looking for a "blue four-door Camry with a dent in the left front fender with a white female and a black male." He said that this was "in the noon hours." Officer Jenkins testified that the Bi-Lo was located in a shopping complex with multiple parking spaces and that across the street was a convenience store called Jiffy. Officer Jenkins testified that he was wearing his police uniform and driving an unmarked police car in the Bi-Lo parking lot when he noticed the vehicle he was searching for in the Jiffy parking lot. Officer Jenkins stated that the car he observed in the Jiffy parking lot "was a blue four-door Camry with the dent in the driver's side." The prosecutor showed Officer Jenkins a photograph, and Officer Jenkins identified it as the vehicle he stopped that day.

Officer Jenkins explained that he observed the vehicle leave the Jiffy parking lot and then pull into the Bi-Lo parking lot. When asked what he saw after the vehicle entered the Bi-Lo parking lot, he said that the vehicle "started what [he] would call cruising or going up and down the lanes, the aisles of the parking lot." Officer Jenkins testified that he saw the vehicle travel up and down three lanes. Officer Jenkins said that there were several free spaces in which the vehicle could have parked, but the vehicle passed by each of these available spaces.

Officer Jenkins said that after observing the vehicle in the Bi-Lo parking lot, he initiated a traffic stop. Officer Jenkins stated that he turned on the blue lights of his unmarked car and stopped in front of the vehicle. He testified that Ms. Ewton was driving and that the Defendant was a passenger seated in the front seat. Officer Jenkins explained that upon exiting his vehicle, he "moved as quickly as possible with [his] tazer drawn towards the front of the vehicle to the driver's side." Officer Jenkins said that he was worried the individuals in the car might have had weapons or been disposing of

evidence. Officer Jenkins testified that as he approached the vehicle, Ms. Ewton raised her hands in the air. When asked what happened when he reached the driver's side door, Officer Jenkins said that he observed "a clear bag of crystal substance" in Ms. Ewton's lap. He also explained that as he "opened the door right at the door jam of the door by the floorboard and seat was another bag of crystal substance." Officer Jenkins instructed Ms. Ewton to exit the vehicle, and he said that she reached into her bra and pulled out another "clear bag of crystal substance" and handed it to him. Officer Jenkins explained that based upon experience from his employment as a police officer, the substance appeared to be crystal methamphetamine. Officer Jenkins said that he found no money when he searched Ms. Ewton.

Officer Jenkins testified that he also instructed the Defendant to exit the vehicle. Officer Jenkins searched the Defendant and discovered $500. Officer Jenkins said that he found a "box of sandwich bags" in the passenger seat of the vehicle. Officer Jenkins also testified that based upon his experience performing "numerous undercover [drug] buys[,]" he believed that the way the vehicle was being driven indicated that someone was "dealing in the drug trade." Officer Jenkins explained that "the vehicle [was moving] up and down the aisles" and "passing up parking spots that [he] would have thought a reasonable person would have" taken. He further explained that parking lots, such as the Bi-Lo parking lot, were typical places for drug deals to transpire. Officer Jenkins testified that he had specifically dealt with drug cases that had occurred in the Bi-Lo parking lot and explained typical drug transactions as follows:

> [Individuals m]eet in the car. I've had experience of [the drug transaction] not lasting . . . more than [fifteen] seconds because it's – it's all done by texting, by the phone, and they pass and they exchange money for the drugs and they're gone. Sometimes [they] pull up and meet and get out, and do the exchange. One person will go to the other car, they'll weigh the drugs right there, [and] they'll leave.

Officer Jenkins testified that drugs are normally packaged into plastic sandwich bags and that the "crystal meth" typically sold for one hundred dollars per gram. Officer Jenkins stated that based upon the information he had received, he placed both the Defendant and Ms. Ewton under arrest.

Officer Jenkins also testified that the Defendant and Ms. Ewton were "[b]oyfriend and girlfriend" and that they resided at "White Beard Circle." Defense counsel objected and argued that there had "been no basis laid to show that [the Defendant] lived" at that location. The trial court responded, "He's saying that you can question him on or how he came about that, if he came about it."

Officer Jenkins testified that he went to the address at White Beard Circle and

-4-

conducted a search of the apartment. Inside, he located a "[m]eth pipe[,]" scales, and some plastic baggies. After being shown a picture of the meth pipe found in the apartment, Officer Jenkins explained that such a device was used to ingest crystal methamphetamine. Officer Jenkins said that he also found "sandwich bag corners cut out[.]" Officer Jenkins testified that based on his experience as a police officer, these items were "used in the drug trade."

On cross-examination, defense counsel questioned Officer Jenkins about his knowledge that the Defendant lived at White Beard Circle. Officer Jenkins said that he did not find any bills or newspaper or magazine subscriptions addressed to the Defendant at the apartment.

Sharon Norman testified that she was employed with the chemistry division of the Tennessee Bureau of Investigation. She said that she performed forensic drug analysis, explaining that she "analyzed evidence submitted for the presence or absence of legally significan[t] substances." Ms. Norman testified that she tested .68 grams of a substance for this particular case and confirmed the presence of methamphetamine.

At the conclusion of the trial, the Defendant was found guilty as charged.

### III. Sentencing

A sentencing hearing was held on August 5, 2016. The Defendant's presentence report was entered as evidence, and the Defendant's daughter testified on behalf of the Defendant.

Denisha Madden testified that the Defendant had eight children and that her father was employed with Koch Food prior to being taken into custody. Ms. Madden also testified that the Defendant was on a leave of absence from the job and that the job would still be available for the Defendant. Ms. Madden said that the Defendant was "loving, kind, [and] caring" and that she did not believe the defendant to be a drug dealer.

On cross-examination, the prosecutor asked Ms. Madden about her father's criminal history. Ms. Madden confirmed that her father was found guilty of murder and attempted murder. She said that she visited her father several times while he was incarcerated and confirmed that the Defendant "was charged within the prison system for possessing drugs and testing positive [for drugs] twice while in prison[.]" The prosecutor also questioned Ms. Madden about the Defendant's employment. She explained that he began his job at Koch Food approximately two months before he was incarcerated prior to his sentencing hearing. Ms. Madden said that she was not aware of the Defendant being employed prior to the job at Koch Food. Ms. Madden also confirmed that in addition to this felony conviction, the Defendant had a misdemeanor conviction for

dealing drugs and had two additional felony charges pending at the time of the sentencing hearing. Ms. Madden said that the Defendant and her brother, who had "a lot of drug problems," were co-defendants in another drug-related matter. Ms. Madden agreed that at the time the two were charged, the Defendant and her brother were "hang[ing] out quite a bit[.]" Ms. Madden also testified that Ms. Ewton was the Defendant's fiancé and said that the two had been dating for approximately seven or eight years. Ms. Madden said that Ms. Ewton was a co-defendant in this case and that she was not aware of Ms. Ewton's having any other convictions. Ms. Madden was not sure where the Defendant would live if he were released.

At the conclusion of the sentencing hearing, the trial court sentenced the Defendant to nine years and six months of incarceration.

## ANALYSIS

### I. Sufficiency

The Defendant argues that there was insufficient evidence to support his conviction for possession of 0.5 grams or more of methamphetamine with intent to sell or deliver. Specifically, he claims that the State failed to prove actual or constructive possession. The State responds that there was sufficient evidence to sustain the conviction. We agree with the State.

An appellate court's standard of review when the Defendant questions the sufficiency of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id., State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"Direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "'a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more.'" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, it is an offense to knowingly "[p]ossess methamphetamine with intent to . . . deliver or sell methamphetamine." Tenn. Code Ann. § 39-17-434(a)(4). If the amount of methamphetamine involved is 0.5 grams or more, the offense is a Class B felony. Tenn. Code Ann. § 39-17-434(e)(1); -417(c)(1).

"Tennessee courts recognize that 'possession' may be either actual or constructive." State v. Ronnie Paul Trusty, No. W2012-02445-CCA-R3-CD, 2013 WL 3488150, at *4 (Tenn. Crim. App. July 11, 2013) (quoting State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001)) (internal quotation marks omitted). Constructive possession exists when a person has "'the power and intention at a given time to exercise dominion and control over [the item] either directly or through others.'" Id. (quoting Shaw, 37 S.W.3d at 903) (finding the evidence sufficient to support constructive possession when a bottle containing cocaine was found on the front seat of a car that was driven by the defendant). "Constructive possession depends on the totality of the circumstances in each case. It may be proven by circumstantial evidence." State v. Robinson, 400 S.W.3d 529, 534 (Tenn. 2013) (citing Tenn. Code Ann. § 39-17-419 (stating that possession may be inferred from "relevant facts surrounding the arrest")).

In this case, the evidence is sufficient to support the Defendant's conviction. Officer Jenkins found three separate baggies containing what was later identified as methamphetamine after stopping Ms. Ewton and the Defendant. One bag was in Ms. Ewton's lap, one bag was located inside her bra, and one bag was found near the driver side door. The Defendant was seated in the front passeger seat, in close proximity to the contraband. It is reasonable to infer that the Defendant could have exercised "dominion and control over [the bags containing methamphetamine], either directly or through" Ms. Ewton. See Trusty, 2013 WL 3488150 at *4. Officer Jenkins testified that before stopping the vehicle, he observed Ms. Ewton driving through the parking lot slowly and passing available spaces. Morever, Officer Jenkins found $500 cash on the Defendant and plastic baggies in the front passenger seat of the vehicle. Based on his experience on

the drug task force, Officer Jenkins explained that all of these factors were typical for the drug trade. Given the totality of the circumstances, we conclude that the evidence was sufficient to sustain the Defendant's conviction for possession of 0.5 grams or more of methamphetamine with intent to sell or deliver.

## II. Officer Jenkins' Testimony

The Defendant asserts that the trial court erred in allowing Officer Jenkins to testify about the Defendant's relationship with Ms. Ewton and the Defendant's residence. The Defendant argues that Officer Jenkins "had nothing more than mere speculation when testifying [the Defendant] and Ms. Ewton were in a relationship, and that [the Defendant] and Ms. Ewton lived together in an apartment on White Beard Circle." The Defendant argues that the "only evidence showing a foundation for [Officer Jenkins'] testimony came at the suppression hearing when Officer Jenkins testified that the confidential informant told him that [Ms.] Ewton was with her boyfriend." The Defendant contends that Officer Jenkins' testimony about the Defendant's relationship status and living arrangements were "rank hearsay and inadmissible[.]" The State argues that the Defendant has waived review of this issue. We agree with the State.

Tennessee Rule of Appellate Procedure 3(e) treats issues "upon which a new trial is sought" as waived "unless the same was specifically stated in a motion for a new trial." Here, the Defendant did not reference his issue regarding Officer Jenkins' trial testimony about the Defendant's relationship with his co-defendant or his living arrangements in his motion for new trial. As such, our review is limited to one for plain error. See Tenn. R. App. P. 36(b).

> A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

Id.

The doctrine of plain error only applies when all five of the following factors have been established:

(1) the record clearly establishes what occurred in the trial court;

(2) the error breached a clear and unequivocal rule of law;

-8-

(3) the error adversely affected a substantial right of the complaining party;

(4) the error was not waived for tactical reasons; and

(5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006).

Here, the Defendant has failed to establish that exclusion of Officer Jenkins' testimony is necessary to establish substantial justice. Even without Officer Jenkins' testimony about the Defendant's being Ms. Ewton's boyfriend and residing with her, there is ample evidence to support the Defendant's conviction as discussed previously. Therefore, the Defendant is not entitled to relief on this issue.

### III. Search and Seizure

The Defendant argues that Officer Jenkins "lacked probable cause or reasonable suspicion to initiate the traffic stop and subsequently search the automobile in which the Defendant was a passenger." Specifically, the Defendant argues that Officer Jenkins lacked probable cause because there was "limited information about the informant's credibility[,]" "no information was revealed about the informant's basis of knowledge[,]" and the "matching description of the car and its occupants [wa]s a completely innocent fact." Furthermore, the Defendant argues that Officer Jenkins should have "waited for someone to approach the vehicle" to confirm that a drug transaction was taking place. The Defendant also argues that "the record is absent of information that [Officer Jenkins] confirmed the driver of the vehicle was Sherry Ewton." Given these facts, the Defendant asserts that "the information received from the informant was not sufficiently reliable and the information received from the informant lacked sufficient corroboration, thus Detective Jenkins lacked reasonable suspicion to make the stop." The State responds that the trial court properly denied the Defendant's motion to suppress because "the informant provided detailed and consistent information on the vehicle, its occupants, and its location, and that Detective Jenkins corroborated this information and developed articulable suspicion sufficient to justify a brief investigatory stop."

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23

(Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. Tennessee's constitutional protections regarding searches and seizures are identical in intent and purpose to those in the federal constitution. State v. Turner, 297 S.W.3d 155, 165 (Tenn. 2009). In evaluating the constitutionality of warrantless searches, this court must "evaluate the search or seizure under traditional standards of reasonableness" by balancing an individual's privacy interests against legitimate governmental interests. Wyoming v. Houghton, 526 U.S. 295, 300 (1999). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 630 (Tenn. 1997). The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search passes constitutional muster. State v. Harris, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

An automobile stop constitutes a "seizure" within the meaning of both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. Delaware v. Prouse, 440 U.S. 648, 653 (1979); State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993). The authorities must have probable cause or an "articulable and reasonable suspicion" to believe that a traffic violation has occurred when they initiate a traffic stop. Whren v. U.S., 517 U.S. 806, 810 (1996). In this case, Officer Jenkins, who had received information from a confidential informant that the Defendant and Ms. Ewton were engaging in a drug transaction, stopped the Defendant.

Before our supreme court's ruling in State v. Tuttle, 515 S.W.3d 282 (Tenn. 2017), Tennessee courts analyzed whether information provided by confidential informants rose to the level of probable cause utilizing the two-pronged test adopted by the United States Supreme Court in Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969). See State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989) (adopting the two-pronged Aguilar-Spinelli test "as the standard by which probable cause will be measured to see if the issuance of a search warrant is proper under [a]rticle 1, [s]ection 7 of the Tennessee Constitution"). The Aguilar-Spinelli test required the

supporting affidavit to show: (1) the informant's basis of knowledge; and (2) the veracity of the informant or the reliability of the informant's information. Id. In Tuttle, our supreme court abandoned the "rigid" Aguilar-Spinelli test and adopted a totality-of-the-circumstances analysis for determining whether an affidavit establishes probable cause for issuance of a search warrant. Tuttle, 515 S.W.3d at 307-08. Our supreme court explained,

> We reiterate that, under the totality-of-the-circumstances analysis, the informant's basis of knowledge and veracity or credibility remain highly relevant considerations. Rather than separate and independent considerations, they "should [now] be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place."

Id. (quoting Illinois v. Gates, 462 U.S. 213, 230 (1983)).

In this case, the Defendant was stopped after Officer Jenkins received information from a reliable confidential informant that Ms. Ewton and another individual were selling drugs in a particular location. Officer Jenkins testified that the informant told him that they had seen Ms. Ewton and this individual selling methamphetamine in the same area the previous day and that they were selling drugs on the day of the stop. At the suppression hearing, Officer Jenkins testified that the informant told him that they also saw the two individuals selling drugs at the location the day of the stop. Officer Jenkins explained that he had relied on this informant multiple times during the previous three years and that information from the informant had led to several arrests and convictions for drug-related offenses. Moreover, Officer Jenkins' observed a vehicle matching the informant's description enter the Bi-Lo parking lot, the area in which the informant said Ms. Ewton and her companion were selling drugs. The informant said that the occupants of this vehicle included the driver, Ms. Ewton, a white female, and a front seat passenger, a black male. Officer Jenkins testified that as he observed the vehicle slowly driving through the Bi-Lo parking lot, he saw a white woman driving and a black man in the front passenger seat. Furthermore, once Officer Jenkins stopped the vehicle, he found a substance that appeared to be methamphetamine in the vehicle. Officer Jenkins adequately established the informant's credibility by explaining his prior reliance on this informant regarding drug cases, and this was bolstered by the corroborating facts Officer Jenkins testified to about locating and stopping this vehicle in the Bi-Lo parking lot. Thus, the Defendant is not entitled to relief regarding this issue.

## IV. Sentencing

The Defendant argues that the trial court abused its discretion when it denied him

-11-

an alternative sentence and sentenced him to nine years and six months of confinement. Specifically, the Defendant argues that the trial court improperly weighed the enhancing factors and mitigating factors of his case according to Tennessee Code Annotated sections 40-35-113 and -114. The State responds that the trial court properly sentenced the Defendant. We agree with the State.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the pruposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2),(4). Thus, before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

## A. Length of Sentence

The trial court determined the length of the Defendant's sentence as follows:

Well, the first thing I have to do is set the length of the sentence. It could be anywhere between eight and twelve years on a – he's Range [I] – sentence, and the way you set the sentence is you take a look at the enhancing and mitigating factors. He actually is – in the back of the [c]ourt's mind . . . a Range II Offender, so which means you have to look a little closer at this thing. Even though he's not going to be punished as a Range II Offender, still, I mean, he's got the record to be a Range II Offender, but anyway, I'm looking at the range in the standard range eight to twelve time span.

And the enhancing factors that would apply in this case would be:

(1) The [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Since this is not being pled as a Range II, all of the convictions are in addition to what would be necessary to get him in the range, so two felonies, misdemeanor, and the two felonies are very[,] very serious felonies.

(2) The [D]efendant was a leader in the commission of an offense involving two or more criminal actors . . . that is an applicable enhancing factor.

(8) The [D]efendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community. We had at least one violation of probation in here, which, you know, is there. I'm not absolutely sure that there wasn't another conviction out of Hamilton County that would fit that bill, but I'll assume that it's not properly documented, so – but there is some proof of that.

With regard to the rest of the enhancing factors, I don't really find – there are 25 enhancing factors, and so he is implicated in at least (1), (2) and (8) of the enhancing factors and because of the very serious crime that he was – the seriousness of the two, murder and attempted murder, felonies you would have to enhance this above the minimum. You cannot say well, that's just so far in the past and it doesn't make a difference. He didn't really have a lot of opportunity to commit a lot of crimes during the 25-year period between then and 2008 when he got out, but the problem is even – we have this record—even when he's incarcerated he's violating the law with regard to drugs. He's got these write-ups where he was caught using drugs and so forth.

So anyway, I believe the sum of the enhancing factors that I've mentioned would cause him to be enhanced – I just jotted down here a year and a half, so I'm going to put his sentence at nine years and six months, and I don't find any significant mitigating factors. You could use (1)

[D]efendant's criminal conduct neither caused not threatened serious bodily injury, but you know, there's not a lot of weight to be placed on, especially in this situation, because in drug sales and so forth they are inherently dangerous, you know, and in this case there doesn't seem to be anything there[.]

. . . .

I don't see anything else. I don't see where the [D]efendant acted under strong provocation or any of these other mitigating factors, and I've looked at all of them, that they apply. So the sentence then will be nine years and six months.

We find the trial court appropriately weighed the enhancing and mitigating factors when determining the length of the Defendant's sentence. See Tenn. Code Ann. §§ 40-35-113; 40-35-114. Thus, the trial court did not abuse its discretion in determining the length of the Defendant's sentence.

## B. Alternative Sentencing

A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6)(A). However, no longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing. Carter, 254 S.W.3d at 347. Tennessee Code Annotated section 40-35-102(6) is now only advisory. See Tenn. Code Ann. § 40-35-102(6)(D).

A trial court should consider the following when determining any defendant's suitability for alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1). A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code Ann. § 40-35-103(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Ultimately, in sentencing a defendant, a trial

court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

An offender is eligible for probation if he or she is sentenced to ten years or less and has not been convicted of certain specified offenses. See Tenn. Code Ann. § 40-35-303(a). While the trial court was required to automatically consider probation as a sentencing option, see Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law, see State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." Hooper v. State, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds, State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978).

After reviewing the presentence report and considering the proof offered at the sentencing hearing, the trial court based its denial of any alternative sentence after weighing the following considerations: the Defendant's physical and mental condition and social history; the facts and circumstances surrounding the offense and the nature and circumstances of the criminal conduct involved; the Defendant's criminal history; the Defendant's potential for rehabilitation; whether the Defendant could reasonably be expected to abide by the terms of his probation; whether the interest of society are being protected from possible future criminal conduct of the Defendant; whether measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the Defendant; whether full probation would unduly depreciate the seriousness of the offense; and whether confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses. The trial court stated, "[W]hen you go through all of these considerations, there's no way you can come up with any conclusion, but that . . . on balance these considerations all argue . . . against probation."

The trial court also reasoned that "restraining a defendant who has a long history of criminal conduct" was necessary to protect society and applied this to the Defendant's case. The trial court concluded that "primarily [the Defendant's] problem" was the Defendant's "long history of criminal conduct" and the Defendant

> [h]ad a very . . . bad record of just trying to serve his time without getting into other trouble here. . . . [T]hese write-ups that [the Defendant] got, he

-15-

had over a period . . . of 13 years . . . starting with a refusal to comply order back in '94. Drug possession and/or selling in '95. In '98 smoking. . . . In 1998 he had refusal to participate in something he was ordered to participate in. A year later he got written up for refusing to follow an order. . . . [H]e had contraband in 2002. Created a disturbance in 2003. He had a positive drug screen in 2005. He abused some way the telephone privileges . . . in '06. He violated somebody's personal property rights . . . in '06. Then he had another positive drug screen in '07. So there's a long period even within the penitentiary where his conduct [was] not – [was] either illegal or violate[d] the rules of his detention, so unfortunately, I don't see anything in this case that would argue against him not just serving his sentence.

We agree that the Defendant's criminal record adequately supports the denial of an alternative sentence. The trial court followed the statutory sentencing procedure, properly weighing the factors and principles in denying alternative sentencing, and placed its reasoning for denying an alternative sentence on the record. Accordingly, the Defendant has failed to establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded to the trial court's denial of alternative sentencing, including probation.

## V. Judgment

We note that in the original indictment, the Defendant was charged for possession 0.5 grams or more of methamphetamine with intent to sell or deliver. However, the indictment incorrectly cited to Tennessee Code Annotated section 39-17-455. In an amended indictment, the document is corrected and cites the correct statute, Tennessee Code Annotated section 39-17-434. The judgment in this case indicates that the Defendant was found guilty of possession of 0.5 grams or more of methamphetamine with intent to sell or deliver; however, the judgment incorrectly lists Tennessee Code Annotated section 39-17-455. We have determined that this is a clerical error and remand the case for entry of a corrected judgment.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed, and the case is remanded for entry of a corrected judgment.

_____
D. KELLY THOMAS, JR., JUDGE